UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| PACTIV CORPORATION, and<br>PACTIV CORPORATION 2010/2011<br>SEVERANCE BENEFITS PLAN, | )<br>)<br>) | CASE NO.: 1:11-cv-7247 |
| | ) | |
| Plaintiffs, | ) | MEMORANDUM OF |
| | ) | DEFENDANT/COUNTERCLAIM |
| v. | ) | PLAINTIFF/THIRD-PARTY PLAINTIFF |
| | ) | CHAD RUPERT IN OPPOSITION TO |
| CHAD RUPERT, | ) | MOTION FOR SUMMARY JUDGMENT; |
| | ) | <u>AND</u> MEMORANDUM IN SUPPORT OF |
| Defendant. | ) | RUPERT'S MOTION FOR SUMMARY |
| _____ | ) | JUDGMENT |
| CHAD RUPERT, | ) | |
| | ) | |
| Counterclaim-Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| PACTIV CORPORATION, | ) | |
| PACTIV CORPORATION 2010/2011 | ) | |
| SEVERANCE BENEFITS PLAN, and | ) | |
| REYNOLDS GROUP HOLDINGS, LTD. | ) | |
| | ) | |
| Counterclaim-Defendants. | ) | |

### TABLE OF CONTENTS

**Page**

Introduction ..................................................................................................................2

Relevant Facts .............................................................................................................4

Summary Judgment Standard ......................................................................................5

Argument and Authorities ............................................................................................6

I.      Rupert is a Third Party Beneficiary of the Merger Agreement ................................6

{01230027.DOC}

A.  Pactiv's Pre-Merger Severance Agreements are Irrelevant ...................................10
B.  The Third-Party Disclaimer Language Doesn't Control ...........................................13

II.  The Merger Agreement does not Create an ERISA Plan .........................................15

III.  Alternatively, Rupert is Entitled to Relief under ERISA...........................................18

A.  Pactiv did not Retain a Right to Amend the Plan ....................................................18
B.  Pactiv Never Amended the Plan ............................................................................20

IV.  The Court Should Award Rupert Relief under the Illinois Wage Collection Act ....20

Defendant and Counterclaim Plaintiff, Chad Rupert, files this Memorandum of Authorities in Opposition to the Motion for Summary Judgment filed by Pactiv Corp., Pactiv Corp. 2010/2011 Severance Benefits Plan, and Reynolds Group Holdings, Ltd. (collectively "Pactiv"). Rupert also files this Memorandum in Support of his Cross-Motion for Summary Judgment.

**Introduction**

This case presents the issue of whether Pactiv unconditionally can promise severance benefits to employees such as Rupert who were displaced by a corporate merger, but later qualify the promise to require the employees to sign a Separation Agreement containing an onerous restrictive covenant. Rupert believes the law prevents this form of bait-and-switch.

The parties have filed cross-motions for summary judgment. The striking aspect of Pactiv's motion is that it unabashedly asks the Court to enforce an agreement Pactiv wishes it had, rather than the agreement Pactiv actually negotiated, wrote and memorialized in a detailed Merger Agreement. Rupert, by contrast, asks the Court to enforce the Merger Agreement as written. This agreement creates a straightforward right

for eligible employees such as Rupert to receive severance benefits, using the following language:

> With respect to any Non-Union Employee not covered by the Company's Amended and Restated Change in Control Severance Benefit Plan for Key Executives, if Parent or the Surviving Corporation terminates the employment of such Non-Union Employee during the Continuation Period, *Parent shall cause the Surviving Corporation to pay to such Non-Union Employee severance benefits as set forth in <u>Section 6.4(d)</u> of the Company Disclosure Schedule.*

*See* Pactiv's Appendix, Ex. 5A, p. 45, Section 6.4(c) (emphasis supplied). The cited language and accompanying Disclosure Schedule require Pactiv Corp. – the Surviving Corporation – to pay the benefits, while it obligates Reynolds Group Holdings – the Parent – to ensure Pactiv lives up to this promise. Both obligations have been breached.

In its summary judgment motion and brief, Pactiv urges the Court to look beyond the plain language in the Merger Agreement to what it obliquely asserts are limitations contained in Pactiv's historic severance policies, none of which are part of the record or have any relevance to the issue at hand. The Court should ignore this feint. The issue at hand is whether the Merger Agreement, as quoted above, combined with the Company Disclosure Schedule – all reinforced by contemporaneous promises from the company CEO – creates severance rights for Rupert, or whether Pactiv can engage in a bait-and-switch by later trying to condition the severance rights on Rupert accepting a restrictive covenant.

Because the undisputed facts show that Pactiv promised to pay severance benefits with no strings attached, the Court should grant summary judgment to Rupert, award damages to Rupert in the amount of the promised benefits, award Rupert

additional relief under the Illinois Wage Payment Collection Act, and award Rupert attorney's fees.

### Relevant Facts

Rupert believes Pactiv has presented largely accurate facts, but also believes Pactiv has presented more facts than necessary to resolve this dispute. The relevant facts are simple.

Rupert formerly worked for Pactiv as General Manager of its Slide-Rite Closure division. *See* Pactiv's Fact Statement and Rupert's Response, ¶ 4, 10. In 2010, Pactiv's shareholders approved a merger with Reynolds Group Holdings. *Id.*, ¶ 28. Pactiv and Reynolds executed a Merger Agreement. *Id.* The Merger Agreement includes an unconditional promise to pay severance benefits to non-union employees terminated without cause after the merger. *See* Rupert's Statement of Additional Facts, ¶ 3.

After the merger, Pactiv terminated Rupert's employment because he declined to relocate to Appleton, Wisconsin. Rupert's Statement of Additional Facts, ¶ 4. It is undisputed that Rupert fits the definition of the employees eligible for severance under the Merger Agreement and accompanying disclosure schedule. *See* Pactiv's Statement of Undisputed Facts, ¶ 15; Response; ¶ 15 (admitting that Rupert was terminated without cause).

As part of Rupert's separation, Pactiv presented him with a Separation Agreement and Release of All Claims, and demanded that he sign the agreement if he wanted to receive severance. *See* Pactiv's Statement of Undisputed Facts, ¶ 18-22; Response, ¶ 18-22; Rupert's Statement of Additional Facts, ¶ 5-6. Rupert declined,

because the agreement contained an onerous restrictive covenant that would have precluded him from working in his field.  Rupert's Statement of Additional Facts, ¶ 6. Rupert demanded that Pactiv pay him the severance it promised in the Merger Agreement and Disclosure Schedule.[1]  Rupert's Statement of Additional Facts, ¶ 11-12.  Pactiv refused. *Id.*

### Summary Judgment Standard

Pursuant to Federal Rule of Civil Procedure 56(a), the Court may grant summary judgment if the moving party shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a).  The burden is on the moving party to show a lack of any genuine issue of material fact.  *Shelton v. Ruiz*, 2012 WL 1952540, at * 2 (N.D.Ill. 2012), citing *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010); *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001).  The non-movant must make a sufficient showing to establish any essential element for which it will bear the burden of proof at trial.  *Shelton*, 2012 WL 1952540, at * 2 (citation omitted).  Only disputes that could affect the outcome of the suit under governing law will properly preclude the entry of summary judgment. *Id.* (citation omitted).  Interpretation of a clear and unambiguous contract is a question of

---

[1] Rupert also relied on the Proxy Statement accompanying the Merger Agreement, but believes the Court can resolve the matter based on the Merger Agreement and Disclosure Schedule.

law and thus suitable for summary judgment. *Geier v. Medtronic, Inc.*, 99 F.3d 238, 244 (7th Cir. 1996).

**Argument and Authorities**

Rupert will address four issues: (1) Rupert is a third-party beneficiary of the Merger Agreement; (2) ERISA does not apply; (3) in the alternative, Rupert is entitled to benefits under ERISA; and (4) the Court should grant relief under the Illinois Wage Payment Collection Act.

**I.     Rupert is a Third Party Beneficiary of the Merger Agreement.**

The undisputed facts show that Rupert is a third-party beneficiary of the Merger Agreement executed by Pactiv and Reynolds, because the agreement promises severance benefits to a particular class of employees of which Rupert is a member. Pactiv Corp. and Reynolds have breached the agreement by: (1) Pactiv failing to pay the severance; and (2) Reynolds failing to ensure Pactiv made the payments.

At the outset, Rupert concedes that his claim and legal theory likely present an issue of first impression in the Northern District of Illinois, if not the Seventh Circuit. Regardless, the theory comports with third-party beneficiary law, and it was expressly recognized in *Prouty v. Gores Technology*, 18 Cal. Rptr. 3d 178, 184-86 (Cal.Ct.App. 2004).

*Prouty*, like this case, involved a corporate merger. The acquiring company promised in a stock purchase agreement to offer employment to employees of the acquired entity. The parties amended the agreement to include a provision that if the acquiring company terminated any employees during the first 150 days after the

stock sale, it would pay severance benefits, and also would indemnify the seller
(Hewlett-Packard) against any claims related to an employee termination. *Prouty*, 18
Cal.Rptr. 3d at 180. The acquiring party then terminated the employees within a week
of closing, and paid them only a limited severance because they, like Rupert, refused to
sign a release. The plaintiff employees then sued under a theory that they were third-
party beneficiaries to the Stock Purchase Agreement.

   After the trial court granted summary judgment to the defendant, the Court
of Appeals reversed, holding that language in the agreement regarding termination and
severance "is a classic third party provision." *Id.*, at 184. The Court found that the
provision regarding severance benefits was "patently intended to preclude early
termination of the affected employees and to provide those terminated soon after the
closing with severance benefits similar to what they would have received had they been
terminated when employed by Hewlett-Packard. *The provision expressly benefits them,
and only them*." *Id.* (emphasis supplied). The Court further found that the seller intended
to protect the plaintiffs against immediate termination and loss of severance benefits,
hence giving rise to a third-party beneficiary claim. *Id.*, at 185.

   While *Prouty* applies California law, the same reasoning and outcome
result in this case from applying Delaware law, which governs the Merger Agreement.
Under Delaware law, intended third-party beneficiaries have an enforceable right under
contracts conferring a benefit to them, even though they are not parties to those contracts.
*Comrie v. Enterasys Networks, Inc.*, 2004 WL 293337, at * 2 (Del.Ch. 2004)
(unpublished opinion), citing *Insituform of N. Am., Inc.*, 534 A.2d 257, 268 (Del. Ch.

1987).  To qualify as a third party beneficiary of a contract, (i) the contracting parties must have intended that the third party beneficiary benefit from the contract, (ii) the benefit must have been intended as a gift or in satisfaction of a pre-existing obligation to that person; and (iii) the intent to benefit the third party must be a material part of the parties' purpose in entering into the contract.  *Madison Realty Partners 7, LLC v. AG ISA, LLC*, 2001 WL 406268, at *5 (Del. Ch. 2001).  "When a promised performance is rendered directly to the beneficiary, 'it is presumed that the contract was for the beneficiary's benefit.'" *Comrie*, 2004 WL 293337, at *3, citing Williston on Contracts, § 37:7, at 55; § 37:8, at 70.

Here, the Merger Agreement creates third-party beneficiary rights, as the promised performance is rendered directly to beneficiaries such as Rupert.  Section 6.4(c) of the Merger Agreement promises severance benefits without qualification: "Parent [Reynolds] shall cause the Surviving Corporation [Pactiv] to pay such Non-Union Employee severance benefits as set forth in Section 6.4(d) of the Company Disclosure Schedule." Pactiv's App. Ex. 5A, at 45, Section 6.4(c) (underlining original).  The obligation to pay severance benefits is unequivocal and mandatory.  The Disclosure Schedule confirms the intent, stating, "[a] Non-Union Employee terminated without cause *shall* be paid [severance benefits]."  Pactiv's App. Ex. 5B (emphasis supplied).

The clear, unambiguous language in Section 6.4(c) shows that the parties identified a specific class of beneficiaries, and intended to confer a direct benefit on them if they were terminated during the continuation period.  The employees were to be paid based on their years of service.  They are identified by class.  The Disclosure Schedule

sets forth a method of calculating severance benefits in detail.  Performance was to be

made directly to the employees. *Comrie*, 2004 WL 293337, at *3.  Pactiv cannot identify

any reason to include a detailed severance commitment and accompanying Severance

Policy except to expressly and directly benefit the affected employees. *See Prouty, supra;*

*see also Halliburton Company Benefits Committee v. Graves*, 463 F.3d 360 (5th Cir.

2006) (former employees allowed to enforce merger agreement provision regarding

retiree medical benefits under ERISA theory).

Continuing, the contemporaneous statements of Pactiv's own CEO,

Richard Wambold, confirm that Pactiv and Reynolds intended displaced employees to

receive severance benefits.  According to Rupert's testimony, "Richard Wambold stood

up in front of all the employees of the corporation when he was disclosing the

information about this merger agreement, and he said that according to Pactiv policy,

anybody displaced by this merger is entitled to severance."  Chad Rupert's Statement of

Additional Facts, ¶ 1.  Further:

> Everybody in the building was spending time
> understanding the impact of the merger to them personally,
> and what would happen if their job was eliminated.  The
> CEO of the company made it clear during the all-employee
> meeting that people would be displaced by the merger and
> that severance would be paid . . . I will paraphrase the
> message that was delivered, the message that people heard
> based on the conversations, and that is, if people are
> displaced, the corporation will take care of you.  Company
> policy is two weeks of severance for every year of service,
> not to exceed 26 weeks.

*Id.*, ¶ 2.

Tellingly, Pactiv's summary judgment papers don't challenge Rupert's description of Wambold's statements or the contemporaneous communications about company policy. These statements and policy confirm a donative intent, namely that Pactiv intended to create third-party rights to benefit the displaced employees for their historical service and to cushion their loss of employment. The employees constitute intended beneficiaries.

The analysis doesn't change if the Court analyzes Rupert's theory under Illinois law, which Pactiv has cited in addition to Delaware law. Under Illinois law, "[a] party is a direct beneficiary if the contracting parties expressed an intent to confer a benefit upon the third party." *Stamp v. Inamed Corp.*, 777 F.Supp. 623, 625 (N.D.Ill. 1991). The contract's express language and surrounding circumstances at the time of contracting determines whether the parties intended to directly benefit the third party. *Id.* The contract, however, need not name a particular third party beneficiary. *Id.*, citing *F.W. Hempel & Co. v. Metal World, Inc.*, 721 F.2d 610, 613 (7th Cir. 1983). As set forth above, Pactiv and Reynolds intended to benefit displaced employees in the form of providing severance, or they wouldn't have included Section 6.4(c) in the Merger Agreement and Section 6.4(d) in the Disclosure Schedule.

Rupert will now address two arguments in Pactiv's brief by which it attempts to avoid the promised severance benefits.

## A.    Pactiv's Pre-Merger Severance Agreements are Irrelevant.

Pactiv's first avoidance argument involves a claim that its *pre-merger* severance agreements required employees to sign separation agreements that included

restrictive covenants, meaning the Court should divine the same obligation in the severance plan created by the Merger Agreement and Disclosure Schedule (the obligation must be divined, because it clearly isn't there). *See* Pactiv's Brief, at 7, 9-10. Pactiv primarily relies on Section 6.4(b) of the Merger Agreement and the Affidavit of Jerry Lindsey to advance this point. *See* Lindsey Affidavit, App. Ex. 7, ¶ 25.

Initially, the Court should reject Pactiv's attempt to rely on unidentified provisions in pre-merger severance programs because the Merger Agreement and Disclosure Schedule are subject to a merger or integration clause. *See* Pactiv's Ex. 5A, at 67-68. This means Pactiv cannot rely on any alleged prior or contemporaneous agreements that contradict the Merger Agreement's express terms. *RTN Investors, LLC v. RETN, LLC*, 2011 WL 862268, at *13 (Del.Super. 2011). Since the express terms of the Merger Agreement mention nothing about signing a separation agreement, Pactiv shouldn't be allowed to sneak in such a requirement under the guise of past practice.

Even if the Court were to consider statements about Pactiv's pre-merger severance programs, basic contract principles show that Section 6.4(c) of the Merger Agreement (which creates Rupert's severance rights) has no relationship to Section 6.4(b) (which addresses pre-merger severance agreements). "Unless there is ambiguity, Delaware courts interpret contract terms according to their plain, ordinary meaning." *Alta Berkeley VI, C.V. v. Omneon, Inc.*, 41 A.3d 381, 385-86 (Del.Supr. 2012). "Contract language is not ambiguous merely because the parties dispute what it means. To be ambiguous, a disputed contract term must be fairly or reasonably susceptible to more than one meaning." *Id.* "Further, 'it is well established that a court interpreting any

contractual provision . . . must give effect to all terms of the instrument, must read the instrument as a whole, and, if possible, reconcile all the provisions of the instrument.'" *Id.* (citations omitted). "The most important guide to the meaning of a contract is what the words most naturally convey." *Martin Marietta Materials, Inc. v. Vulcan Materials Co.*, 2012 WL 1605146, at * 26 (Del.Ch. 2012). To the extent ambiguity exists, it is construed against the drafter. *Shiftan v. Morgan Joseph Holdings, Inc.*, 2102 WL 120196, at * 5 (Del.Ch. 2012)

Applying these principles, Pactiv's argument regarding pre-merger severance programs identified in Section 6.4(b) has no merit. Rupert doesn't rely on Section 6.4(b). His claims arise under Section 6.4(c). Section 6.4(c) says nothing about displaced employees having to sign separation agreements or restrictive covenants before they can receive severance benefits. The promise is unconditional. Section 6.4(c) says nothing about adopting any terms or conditions from pre-merger severance programs. The plain language leads to the conclusion that Section 6.4(c) means what it says: displaced employees will/shall/must get severance benefits, regardless of what Pactiv's historic programs might have said. *Martin Marietta*, *supra; see also Alta Berkeley*, 41 A.3d at 388 ("Courts will not torture contractual terms to impart ambiguity where ordinary meaning leaves no room for uncertainty.") (citation omitted).

The Court also should reject Pactiv's argument regarding pre-merger severance agreements because it relies on inadmissible extrinsic evidence, i.e. the Lindsey affidavit. *See Benchmark Capital Partners IV, L.C. v. Vague*, 2002 WL 1732423, at * 6 fn. 28 (Del.Ch. 2002). "[U]nless the contract is ambiguous, extrinsic

evidence may not be considered; and the document should be construed 'as a whole' to reconcile, if possible, all of its provisions." *Id.* Lindsey's affidavit improperly opines that the post-merger severance agreements "mirror" the pre-merger severance agreements, the actual terms of which are neither relevant nor part of the record. *See* Lindsey Affidavit, App. Ex. 7, ¶ 25. The Court has no reason to consider pre-merger agreements and no reason to consider Lindsey's affidavit, given the plain language in the Merger Agreement regarding post-merger agreements.

As a final point, Pactiv's argument on this issue ultimately shows that Rupert is right. Pactiv historically knew how to write a severance plan that had conditions, at least according to its affiant and summary judgment brief. It also knew how to negotiate and write a single-spaced, 50+ page Merger Agreement that contains mind-numbing detail on every legal and financial point imaginable. Yet Pactiv didn't include any of the conditions it now wants the Court to enforce. This silence speaks as loudly as the dog that didn't bark in the Sherlock Holmes story.[2]

**B. The Third-Party Disclaimer Language Doesn't Control.**

Pactiv's second avoidance strategy is to argue that the Merger Agreement contains a boilerplate provision disclaiming any third-party beneficiary rights, meaning, in its view, Rupert cannot enforce what Pactiv promised. This argument fails. *Prouty* addresses it directly. The *Prouty* Court applied the basic contract law principle that

---

[2] *See Thomas v. Pierce, Hamilton & Stern*, 967 F.Supp. 507, 508, n. 2 (N.D. Georgia 1997) (A "dog that didn't bark" analogy, so named after the deciding clue in a Sherlock Holmes mystery, is a theory which attempts to prove its own validity based upon the absence of an expected occurrence. In *Silver Blaze*, Sherlock Holmes deduces from a dog's failure to bark that it was the trainer who attempted to harm a valuable horse. Sir Arthur Conan Doyle, *Silver Blaze*, in THE COMPLETE SHERLOCK HOLMES 383, 400 (1953). It is now relatively common to refer to "the dog that didn't bark" as a way of describing the inferences that flow from the failure of the expected to happen. Frederick Schauer, *Liars, Novelists, and the Law of Defamation*, 51 Brook. L. Rev. 233, 241 (Winter, 1985); *see also Chisom v. Roemer*, 501 U.S. 380, n.23, 115 L. Ed. 2d 348, 111 S. Ct. 2354 (1991) ).

specific language in a contract controls general language. The Court aptly observed that the only reason to include a provision protecting employees' rights and/or granting them severance is to directly benefit them and expressly grant them rights. *Prouty*, 121 Cal.App. 4th at 1234-35, 18 Cal.Rptr. 3d at 185.

Delaware law recognizes the same legal principle. "Specific language in a contract controls over general language, and where specific and general provisions conflict, the specific provision ordinarily qualifies the meaning of the general one." *DCV Holdings, Inc. v. Conagra, Inc.*, 889 A.2d 954, 961 (Del. 2005). Here, the specific language promising severance benefits controls over the more general disclaimer. Otherwise, the promise regarding severance is hollow.

Indeed, Pactiv's position would effectively eradicate the ability for anyone to enforce Section 6.4(c) and the Disclosure Schedule. Assuming Section 6.4(c) and the Disclosure Schedule create rights to severance benefits, then under Pactiv's theory, the only parties who could enforce those rights are Pactiv or Reynolds, neither of whom have any reason to do so. The rights only benefit the recipients of severance. Pactiv's argument would rob these beneficiaries of any enforcement mechanism. Because the Court should construe the contract to give effect to every provision, leaving none superfluous, *Alta Berkeley VI*, 41 A.3d at 385-86, the Court should reject Pactiv's argument that no one can enforce Section 6.4(c).

Rupert also believes that Pactiv inadvertently has admitted that the Merger Agreement was intended to confer rights on third parties, as it alternatively argues that the Merger Agreement created an ERISA-governed severance plan. *See* Pactiv's Brief, at

10-15.  Since ERISA plans by definition have beneficiaries, e.g. Rupert, Pactiv has

admitted that the Merger Agreement was intended to benefit third parties.

At the end of the day, the Court faces a straightforward question: did

Pactiv's promise of severance benefits to employees such as Rupert – with no strings

attached – create a real benefit, or was Pactiv later allowed to change its mind to handcuff

displaced employees from competing with Pactiv, even though these employees were

displaced through no fault of their own?  Rupert submits that Pactiv cannot engage in this

kind of bait-and-switch.

## II.     The Merger Agreement does not Create an ERISA Plan.

Pactiv alternatively tries to avoid Rupert's state law claims by arguing that

severance benefits created under the Merger Agreement and Disclosure Schedule create

an ERISA plan, meaning the state law claims are pre-empted.  This argument is the first

step in Pactiv's two-pronged theory that once an ERISA plan exists, Pactiv can change

the plan at its whim. *See* Section III *infra*.  This argument fails on both levels.

At the first level, the Merger Agreement and Severance Policy do not meet

the black-letter test for an ERISA-governed severance plan.  For a severance plan to

qualify as a plan, fund or program under ERISA, a reasonable person must be able to

ascertain four things: (a) its intended benefits; (b) a class of beneficiaries; (c) source of

financing; and (d) procedures for receiving benefits. *Bongiorno v. Associates in*

*Adolescent Psychiatry, S.C.*, 1993 WL 313096, at *1 (N.D.Ill. 193); *Allen v. Baxter*

*Intern., Inc.*, 2006 WL 560608, at * 7 (N.D.Ill. 2006); *Metropolitan Life Ins. Co. v.*

*Goeden*, 2010 WL 2698275, at *3 (S.D.Ill. 2010); *Bannister v. Sorenson*, 103 F.3d 632,

636 (8th Cir. 1996); *Ljubisaveljevic v. National City Corp.*, 2007 WL 1577759, at *2 (S.D.Ohio 2007). "The Plan must be a reality, 'something more than a mere decision to extend benefits.'" *Allen*, 2006 WL 560608, at *7, quoting *Diak v. Dwyer, Costello & Knox, P.C.*, 33 F.3d 809, 811 (7th Cir. 1994).

       The Merger Agreement and Severance Policy fail to meet all four of these requirements. Although the documents identify the intended benefits and class of beneficiaries, neither document allows a reasonable person to ascertain a source of financing or procedures for receiving benefits. These omissions alone suggest considerable doubt that an ERISA plan exists.

       Next, neither document calls itself an ERISA plan or suggests that the Merger Agreement creates a severance plan under ERISA. The Merger Agreement's chief discussion of ERISA regards Pactiv's ERISA obligations existing *before* the merger. *See* Section 4.8. The Merger Agreement contains excruciating detail on dozens of other points, but its discussion of the post-merger severance benefits amounts to a single sentence, plus the Disclosure Schedule. If Pactiv truly had wanted to establish an ERISA-governed plan using the Merger Agreement, it would have said so and presumably would have included the necessary detail to achieve it.

       Next, courts have held that merger agreements are not, in of themselves, ERISA plans. *Ljubisaveljevic v. National City Corp.*, 2007 WL 1577759, at *5 (S.D.Ohio 2007); *Dwyer v. Galen Hospital Illinois, Inc.*, 1996 WL 111886, at *10 (N.D.Ill. 1996) (an informal written document such as a purchase agreement cannot legally operate to amend a plan document).

Next, Pactiv exaggerates the level of "ongoing administration" contemplated by the severance benefit program created by the Merger Agreement and Disclosure Schedule. The program requires a straightforward mathematical calculation after an equally-straightforward determination of eligibility involving largely yes-and-no questions, e.g. whether the employee was union or non-union and whether the employee was terminated for cause. *See Bowles v. Quantum Chem. Co.*, 266 F.3d 622, 633 (7th Cir. 2001), *rhrg denied*, (the minimal quantum of discretion needed to determine whether an employee had been terminated for cause was insufficient to implicate ERISA).

Pactiv's arguments regarding ERISA preemption also ignore that the Merger Agreement generates distinct and independent bases of liability for Pactiv and Reynolds. Both Pactiv and Reynolds signed the Merger Agreement. Rupert claims each of them is jointly and severally liable for the benefits. Pactiv has the primary obligation, as it remained Rupert's employer after the merger and ultimately terminated his employment. Reynolds, however, has a separate obligation. The Merger Agreement committed Reynolds to ensuring that Pactiv would pay the severance benefits. Section 6.4(c) states: "Parent [Reynolds] *shall* cause the Surviving Corporation [Pactiv] to pay such Non-Union Employee severance benefits as set forth in Section 6.4(d) of the Company Disclosure Schedule." (italics supplied). This means the state law claims against Reynolds arise from its failure to compel the Surviving Corporation – Pactiv – to honor the Merger Agreement and Severance Policy. Reynolds' breach therefore differs analytically from Pactiv's breach, and is wholly removed from ERISA. *See* Section IV *infra*.

**III.**     **Alternatively, Rupert is Entitled to Relief under ERISA.**

Even if Pactiv is correct that the Merger Agreement and Disclosure Schedule create an ERISA severance plan, Pactiv errs by claiming Rupert cannot enforce its terms.  A beneficiary of an ERISA plan has a statutory right to maintain a civil action to enforce his rights under the terms of the plan.  29 U.S.C. § 1132(a)(1)(B); *Halliburton*, 463 F.3d at 375-76.  Therefore, if the Merger Agreement and Disclosure Schedule suffice to create an ERISA plan, Rupert has standing to enforce them.

Pactiv tries to avoid any ERISA obligations created by the Merger Agreement and Disclosure Schedule by claiming it retained an unfettered right to amend the plan, including amending it to add a requirement that an eligible employee such as Rupert must sign a Separation Agreement.  The undisputed facts belie this claim – for two reasons: (1) Pactiv did not retain a right to amend the plan; and (2) Pactiv never amended the plan.

**A.**     **Pactiv did not Retain a Right to Amend the Plan.**

In order to amend a welfare benefit plan governed by ERISA, the employer must provide a procedure for amending such plan, and for identifying the persons who have authority to amend the plan.  29 U.S.C. § 1102(b)(3).  In interpreting this statutory section, the Supreme Court has stated: "The test of § 402(b)(3) actually requires two things: a 'procedure for amending [the] plan" and '[a procedure] for identifying the persons who have authority to amend the plan.'" *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 80, 115 S.Ct. 1223, 1228, 131 L.Ed.2d 94 (1995) (punctuation and italics original).  Only an amendment executed in accordance with the

plan's procedures is effective. *Halliburton,* 463 F.3d at 372, citing *Williams v. Plumbers & Steamfitters Local 60 Pension Plan*, 48 F.3d 923, 926 (5th Cir. 1995).

Here, the Merger Agreement and Disclosure Schedule contain no procedure for amending the severance plan created under Section 6.4(c), nor do they contain a procedure for identifying the persons who have authority to amend the plan. As such, even assuming the Merger Agreement and Disclosure Schedule actually create an ERISA plan, Pactiv has no legal basis to amend the plan, including no right to condition severance benefits on employees submitting to restrictive covenants.

Pactiv seemingly recognizes this problem, as it tumbles again to its refrain that the Court should treat the severance program created by the Merger Agreement as if it stands on the same footing as severance programs existing before the merger – despite no language in the Merger Agreement compelling or even suggesting such a result. Pactiv's argument lacks merit. In what ultimately is a very telling sentence, Pactiv urges that the Merger Agreement "expressly allows RGHL to amend any pre-merger severance arrangement, subject only to its obligation under Section 6.4(c) to preserve those terms listed in the Disclosure Schedule." Pactiv's Brief, at 14. This sentence proves Rupert's point. It not only acknowledges that the only amendment rights identified in the Merger Agreement relate to pre-merger severance programs – not the severance program created by the merger itself – but it also concedes that any attempted amendment must preserve the unconditional severance benefits promised in Section 6.4(c).

**B.  Pactiv Never Amended the Plan.**

Even if Pactiv could be heard to claim a right to amend the severance plan created by the Merger Agreement and Disclosure Schedule, Pactiv has not offered any evidence that it did, in fact, effect such an amendment.  To be effective, Pactiv would have needed to execute the amendment before it terminated Rupert's employment.  Pactiv has not identified any evidence to show that it executed any amendment to the Plan consistent with an amendment process contained in the Plan.

Given the foregoing, if the Court determines that the Merger Agreement and Disclosure Schedule constitute an ERISA plan, the Court should award Rupert the benefits outlined below, along with attorney's fees under 29 U.S.C. § 1132(g)(1).

**IV.  The Court Should Award Rupert Relief under the Illinois Wage Collection Act.**

In connection with his third-party beneficiary claim, Rupert also seeks relief under the Illinois Wage Payment Collection Act, 820 ILCS 115/1 et seq.  Rupert believes that once the Court concludes that Pactiv and Reynolds owe him severance under the Merger Agreement, he necessarily must prevail on his statutory wage claim.

First, the promised severance benefits constitute "wages" or "final compensation" as defined by the Act.  820 ILCS 115/2; *Metropolitan Distributors, Inc. v. Illinois Dep't of Labor*, 449 N.E.2d 1000, 1003-04, 114 Ill.App.3d 1090, 1094-95 (Ill.App. 1st Dist. 1983) (severance pay constitutes final either wages or final compensation under the Illinois Wage Payment Collection Act).

Second, both Pactiv and Reynolds fit the definition of "employer," meaning they are jointly and severally liable. *See* 820 ILCS 115/2.  The statute defines

"employer" to include "any individual, partnership, association, corporation, limited liability company, business trust, employment and labor placement agencies where wage payments are made directly or indirectly by the agency or business for work undertaken by employees under hire to a third party pursuant to a contract between the business or agency with the third party, *or any person or group of persons acting directly or indirectly in the interest of an employer in relation to an employee*, for which one or more persons is gainfully employed." *Id.* (emphasis supplied).

Pactiv admits it employed Rupert. That point is given. *See* Pactiv's Statement of Undisputed Facts, ¶ 4. As for Reynolds, the Court should hold it accountable as Rupert's "employer" by virtue of Reynolds committing as the Parent under the Merger Agreement to ensure that Pactiv would pay the severance. In that role, Reynolds acted directly or indirectly in the interest of Pactiv in relation to Rupert. 820 ILCS 115/2. Reynolds is separately liable.

Turning to Rupert's relief, the Court should award Rupert the severance benefits plus a penalty of two percent per month beginning July 29, 2011, plus attorney's fees. *See* 820 ILCS 115/14(a). Rupert calculates the amounts due as follows:

1. Severance: $67,326.38

2. Bonus: $32,350.20

3. Penalty: $13,465.30

*See* Rupert's Statement of Additional Facts, ¶ 12.

Rupert further requests leave to submit an attorney's fee application post-ruling.

WHEREFORE, Defendant and Counterclaim Plaintiff, Chad Rupert, respectfully requests that the Court enter judgment in his favor and against Pactiv Corp. and Reynolds Group Holdings, award damages as set forth herein, permit Rupert to submit an application for attorney's fees, and for such other further relief as the Court deems appropriate.

*/s/ Vernon P. Squires*

VERNON P. SQUIRES (ARDC #6216894)
of
BRADLEY & RILEY PC
2007 First Avenue SE
P.O. Box 2804
Cedar Rapids, IA  52406-2804
Phone: (319) 363-0101
Direct Dial: (319) 861-8702
Fax:     (319) 363-9824
Email:  vsquires@bradleyriley.com

*ATTORNEYS FOR THE DEFENDANT*
*CHAD RUPERT*

Copy to:

Norma W. Zeitler
Christine E. Skoczylas
Bart A. Karwath
Barnes & Thornburg LLP
One North Wacker Drive
Suite 4400
Chicago, IL  60606

*Attorneys for Plaintiffs*
*Pactiv Corporation and*
*Pactiv Corporation 2010/2011*
*Severance Benefits Plan*

James B. Carroll, Esq.
Standard Bank Building
7800 West 95th Street
Second Floor East
Hickory Hills, IL  60457

*Local Counsel for the Defendant*
*Chad Rupert*

CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true copy
of this document was served upon the persons listed
on this document at the addresses indicated by CM/ECF
electronic notification or by enclosing the same in an
envelope with postage fully paid and by depositing said
envelope in a United States Post Office depository this
8th day of June 2012.  I declare under penalty of
perjury that  the foregoing is true and correct.

*/s/ Janet Privratsky*